**RELIANCE UNIVERSAL,
INC., Appellant,**

v.

**SPARKS INDUSTRIAL SERVICES,
INC., Appellee.**

**No. 09 83 250 CV.**

Court of Appeals of Texas,
Beaumont.

March 28, 1985.

Rehearing Denied April 18, 1985.

B. Edward Williamson, Michael J. Mazzone, Houston, for appellant.

Larry Hunter, Buddie J. Hahn, Vidor, for appellee.

## OPINION

BURGESS, Justice.

This is a Deceptive Trade Practices Act (DTPA) case, complicated by a plea in abatement question. The specific facts will be discussed as they relate to each point of error. The parties, for simplicity, will be referred to as Sparks and Reliance.

Point of error number one alleges the trial court erred in overruling Reliance's plea in abatement. In July, 1980, Reliance filed an action in Harris County against Sparks alleging Sparks had failed to pay for materials sold and delivered to it. On September 9, 1980, Sparks filed suit in Orange County alleging Reliance had made certain express warranties concerning the materials and the materials were unfit for the purpose intended, had breached an implied warranty of merchantability, had breached the implied warranty of fitness, had engaged in false, misleading, or deceptive acts or practices, was negligent in failing to properly test and maintain the quality of the materials, was negligent in failing to properly supervise and instruct Sparks employees in the proper applications of Reliance's products and had furnished a defective product under the doctrine of strict liability.

On September 30, 1980, a default judgment was entered against Sparks in Harris County. Subsequently, Sparks was granted a new trial. Sparks then filed a plea of privilege, and it was overruled. Sparks appealed and in December, 1980, the first Court of Appeals affirmed the Harris County trial court. In the meanwhile, Reliance had filed a plea in abatement seeking to abate the Orange County suit because of the prior suit being filed in Harris County. Reliance filed its plea alleging the parties and controversy in each suit were identical and thus, the Harris County suit having been filed first, the second suit should be abated. *Curtis v. Gibbs*, 511 S.W.2d 263 (Tex.1974) recognized the general common law rule in this area. The controlling issue in our case is whether or not Sparks' causes of action were compulsory counterclaims under *TEX.R.CIV.P. 97(a)*. If they were, abatement was required, if not, it was not required. In order for Sparks' claims to be compulsory counterclaims they must have arisen out of the same transaction or occurrence. Reliance's original claim in Harris County was based upon a failure to pay for material supplied, i.e., breach of contract. Some of Sparks' claims in the Orange County action do arise out of the same transaction and are compulsory counterclaims. Some of Sparks' claims, specifically, the negligence allegations, do not arise out of the sales contract. The sales transaction was completed upon the delivery of the materials to Sparks and Reliance's course of action arose out of Sparks' failure to pay for the materials. Venue in that case was set because the sale invoices call for payment in Harris County. Sparks' negligence claims arose after the sales transaction was completed and when Reliance came to Orange County to aid Sparks in applying the materials to the railway cars. These alleged negligent acts were separate and apart from any contract for the sale of materials. Therefore, they are not compulsory counterclaims.

If part of Sparks' course of action is not a compulsory counterclaim, then the trial court is not required, as a matter of law, to abate the second action. We find no abuse of discretion in not abating. Point of error number one is overruled.

The second point of error claims the trial court erred in submitting the damage

issue and, thereafter, erred in not granting Reliance's motion for judgment notwithstanding the verdict because the damages were limited by the contract between Sparks and Reliance.

In January 1980, Sparks contacted Reliance about the purchase of paint in order to reline some railroad hopper cars belonging to Cities Services Company. Several orders were placed and the transaction, several invoices and packing slips were received by Sparks. Reliance claims these invoices constituted a written contract between the parties and each invoice and packing slip contained language which limited Reliance's liability. The following language appeared:

> Since methods and conditions of application and use are beyond our control, the products described below are sold and received without warranty of suitability or fitness for Buyer's particular purpose and subject to the condition that Seller's liability as to any product (a) is limited to a failure of the product caused by its non-conformance with the original shipment or sample sent to the Buyer, as to which written claim is made within 30 days from date of shipment, and (b) is in any event limited to the return of the purchase price. Please see Condition 2 and other conditions on the reverse side of the customers [sic] acknowledgment for complete terms of sale.

Reliance alleges the language in the invoices are part of the contract and are allowable under *TEX.BUS. & COM.CODE ANN. sec. 2.719* (Vernon 1968). The effect of this would be to limit Reliance's liability to the purchase price of the paint.

Sparks answers that *TEX.BUS. & COM. CODE ANN. sec. 17.42* (Vernon Supp.1985) makes such clauses void and unenforceable, that *TEX.BUS. & COM.CODE ANN. sec. 2.316* (Vernon 1968) requires such clauses to be "conspicuous" and that the clause in question is not, and that the clause is effective only to limit a recovery based upon contract and not a recovery based upon violations of the DTPA. As to Sparks first contention, *Ellmer v. Del-*

*aware Mini-Computer*, 665 S.W.2d 158 (Tex.App.—Dallas 1983, no writ) addressed the question of whether sec. 17.42 of the DTPA rendered provisions made under 2.719 unenforceable. The court stated at 161: "We conclude the question has been resolved adversely to Datafast by *G–W–L, Inc. v. Robinchaux*, 643 S.W.2d 392 (Tex. 1982), where the Supreme Court gave effect to the disclaimer in a deceptive trade practice case." Our reading of *G–W–L, Inc. v. Robinchaux, supra,* does not lead us to the blanket statement of the Dallas Court. *G–W–L* was breach of warranty case and we believe the Supreme Court's holding is limited only to that type of action, not to deceptive trade practice cases in general. In any regard, sec. 17.42 does not render contractual limitation clauses void and unenforceable in any and all cases.

Sparks' next contention seeks to apply *TEX.BUS. & COM.CODE ANN. sec. 2.316* (Vernon 1968) to the contractual limitations allowed by sec. 2.719. This would be the case, if the limitation in this case was an attempt to modify or excluded a warranty. It is not. It is a contractual limitation on the amount of damages recoverable.

A similar case is *Rinehart v. Sonitrol of Dallas, Inc.*, 620 S.W.2d 660 (Tex.Civ.App. —Dallas 1981, writ ref'd n.r.e.). Here suit was brought for breach of an express warranty under the DTPA. The court held the contract between the parties constituted a warranty under the DTPA, but since the plaintiff was relying upon the express warranty in the contract, the plaintiff was bound by a $5000.00 limitation contained in the warranty. The thing that distinguishes the instant case from the others is that here Sparks pleaded and received favorable jury answers to a sec. 17.46 DTPA cause of action in addition to the breach of warranty action. The jury found Reliance had represented the goods were of a particular standard, quality or grade when they were of another and had represented the goods had characteristic ingredients, uses or benefits which they did not have. They further found such representations to be a producing cause of Sparks' damages. Were this

case solely a breach of contract case or a breach of warranty case, Reliance's arguments would be somewhat persuasive, but it is not. Reliance can not urge the contractual limitation provision as a defense to a sec. 17.46 DTPA misrepresentation cause of action. Point of error number two is overruled.

■ Reliance's final point of error is the trial court erred in overruling their motion for judgment notwithstanding the verdict because there is no evidence to support the jury's answer to the damage issue and the trial court erred in overruling their motion for new trial and entering judgment because there is insufficient evidence to support the jury's answer to the damage issue. Reliance's attack is two pronged. First, they question the evidence used to determine the lost profit per railroad car and second, they question the evidence as to the number of cars to be relined. Reliance admits that Sparks had a contract with Cities Service to reline 25 cars at a price of $1,665.00 per car. The evidence concerning the bid price is as follows:

"[SPARKS ATTORNEY]: Now, initially, ..., when you bid this job with Cities Service, was there some type of calculations that you figured to come up with your bid price?

"[WITNESS]: Yes. I calculated each job to see what the cost was prior to making the bid.

and sixty-five dollars, could you tell the Jury how you arrived at that figure?

"[WITNESS]: Yes. We calculate—first calculate the materials. These cars are five thousand two hundred and fifty cubic feet. That's approximately twenty-seven hundred and fifty square feet. The paint specifications sheets from the manufacturer tell you how many square feet that a gallon of paint will cover for the millage desired. So, using the number the paint calls for the primer per car, one gallon according to Reliance's specification sheets, one gallon of Rel-Pon 70 mixed covers two hundred and ninety-eight square feet for four mills. We know ourselves from our own experience that you need to add approximately twenty-five percent excess. So we add twenty-five percent excess and this calculates out to eleven point five six gallons of paint. We round that off to twelve gallons for cost purposes and that's what we ordered.

"[SPARKS ATTORNEY]: What did you determine to be—

"[WITNESS]: Plus thinner, excuse me.

"[SPARKS ATTORNEY]: Okay. What did you determine to be the cost of paint including the base and top coat?

"[WITNESS]: Base and top coat. The cost of paint was Six Hundred Seventy-three dollars. That's including thinner. I haven't added the—there's miscellaneous costs that I add to this for sand, for the blasting sand, and for the tape and various condiments that you use, paper, so this total price is Eight Hundred Thirty-one Dollars cost per car. We try to bid fifty percent gross profit so we double that figure. So we arrived at the Sixteen Hundred Sixty-five dollars.

"[SPARKS ATTORNEY]: Is that a representative figure of cost ordinarily in the job?

"[WITNESS]: Yes, it is. We might bid a job a little higher than that if it's just for a small amount of cars, number of cars. But these are new cars we're speaking of. New cars are all bid—

"[SPARKS ATTORNEY]: Would old cars be charged out at higher than that?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: Why would that be?

"[WITNESS]: They take more labor.

"[SPARKS ATTORNEY]: In what respect?

"[WITNESS]: Incidentally, I stand corrected. I gave you labor and materials in this Six Hundred and something dollars. Paint actually cost Three Hundred Fifty-Three Dollars per car.

"[SPARKS ATTORNEY]: Okay. But the total labor, materials and everything was Eight Thirty-One?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: Tell the Jury very briefly why it is that old cars would require more labor to do than new cars?

"[WITNESS]: It takes longer to blast out the old paint inside the cars than it does to remove mill scale. If you're doing complete reline, you blast out the old paint completely so depending on how tough a product is to remove, it usually takes—we'll spend an average of six—let's say eight man hours for a new car and you'll spend something like close to twenty man hours for an old car to blast it out. So you have more labor. The material and sand cost is the same.

"[SPARKS ATTORNEY]: So approximately what is the average cost of relining an old car?

"[WITNESS]: Approximately a thousand dollars, then, at that time.

"[SPARKS ATTORNEY]: Well, what I'm speaking of is to sandblast a typical relining job on an old car?

"[WITNESS]: Yes. A thousand dollars.

"[SPARKS ATTORNEY]: I thought you said that old cars are more expensive, cost more to do than new cars?

"[WITNESS]: Well, new cars cost Eight Thirty-one.

"[SPARKS ATTORNEY]: Oh, I'm sorry. You're giving me—what I'm talking about is the total charge.

"[WITNESS]: Oh, my charge at that time was two thousand dollars for an old car.

"[SPARKS ATTORNEY]: And what would you estimate to be your cost of doing that job?

"[WITNESS]: A thousand dollars.

"[SPARKS ATTORNEY]: So, again, your gross profit on the job would be approximately a thousand dollars on a relining job and approximately eight hundred thirty dollars, or thereabouts, on a new car?

"[WITNESS]: Yes. Our objective is fifty percent gross profit.

"[SPARKS ATTORNEY]: Now, have you done some calculations concerning the profit which you would have expected to receive from the initial twenty-five car order?

"[WITNESS]: Yes, I have.

"[SPARKS ATTORNEY]: How much would that be?

"[WITNESS]: The total revenue would have been forty-one thousand six hundred twenty-five dollars and our profit figure would have been half of that; fifty percent.

"[SPARKS ATTORNEY]: Approximately what would that be?

"[WITNESS]: I need my calculator. I have all the new cars, the profit—

"[SPARKS ATTORNEY]: What was that figure again, forty-two thousand?

"[WITNESS]: Forty-one thousand six twenty-five. I have all of the cars that was discussed, the profit factor worked out on that.

"[SPARKS ATTORNEY]: You were paid for one of those cars, weren't you?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: Sixteen hundred and sixty-five dollars?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: So then the gross would come back down to—I think we could round it off to forty—it would actually be thirty-nine thousand nine hundred and eighty?

"[WITNESS]: Yes. Pardon? Twenty. Oh, yes, the gross.

"[SPARKS ATTORNEY]: Then your gross business profit would have been half of that, or approximately twenty thousand dollars?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: What about on the additional sixty-one car order if you had been able to get that order?

"[WITNESS]: That would have been a hundred and one thousand five hundred sixty-five revenue. I have the total profit figure for all the cars.

"[SPARKS ATTORNEY]: Why don't you give that to me?

"[WITNESS]: Two hundred thirty-seven thousand eight hundred eighty-two dollars was the profit. The revenue would have been four hundred eighty-one thousand eight hundred and ninety dollars. That's for the two hundred and sixty-one and the twenty-thousand eight hundred and ninety dollars. That's for the two hundred and sixty-one and the twenty-five."

■ To recover for lost profits, it is not necessary that the loss be susceptible to exact calculation. It is sufficient that the amount of loss is shown by competent evidence with reasonable certainty. *Southwest Battery Corporation v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938); *White v. Southwestern Bell Telephone Co., Inc.*, 651 S.W.2d 260 (Tex.1983). There was evidence to the effect that Sparks had not obtained a fifty per cent profit margin on an annual basis. There was additional testimony on this point:

"[SPARKS ATTORNEY]: Just to cover a couple of points with you if I could. Mr. Williamson had pointed out, for example, in 1980 there was only a 27 percent margin from gross profit; is that correct?

"[WITNESS]: That's for the total year, yes.

*    *    *    *    *    *

"[SPARKS ATTORNEY]: Now, in December or January of 1980 when you started, I believe you told the jury you were trying to obtain this 50 percent margin. Were you able to do that?

"[WITNESS]: Not the first month, not in November. It took about a month, 35, 40 days to get our system in operation in getting the work-flow coming.

"[SPARKS ATTORNEY]: What about in January? Were you able to—

"[WITNESS]: In December, yes, we did.

"[SPARKS ATTORNEY]: What about in January?

"[SPARKS ATTORNEY]: What about February?

"[WITNESS]: February, yes. We exceeded it 50 percent.

"[SPARKS ATTORNEY]: What about March?

"[WITNESS]: March, yes.

"[SPARKS ATTORNEY]: What about April?

"[WITNESS]: April, yes.

"[SPARKS ATTORNEY]: What about May?

"[WITNESS]: Yes.

"[SPARKS ATTORNEY]: What about June?

"[WITNESS]: June, our gross profit was okay, but our revenue had started dropping drastically in June. I think the charts will show that there. We couldn't achieve our—

"[SPARKS ATTORNEY]: In July were you able to achieve that 50 percent?

"[WITNESS]: No.

"[SPARKS ATTORNEY]: Or thereafter?

"[WITNESS]: No, not thereafter.

"[SPARKS ATTORNEY]: What do you attribute that to?

"[WITNESS]: This episode with the Reliance paint.

"[SPARKS ATTORNEY]: Specifically, though, excluding that, from a dollar standpoint, what are you—loss of revenue?

"[WITNESS]: Loss of revenue, yes.

"[SPARKS ATTORNEY]: But during this period of time, February, March, April of 1980, you were achieving a 50 percent profit margin.

"[WITNESS]: Yes, sir, in excess."

The evidence was conflicting on the point. It was for the jury to determine which figure was correct. *White, supra.* The witness was an experienced businessman and manager. The jury certainly had the right to disregard or give no weight to his testimony. The testimony was given in terms of calculations and thus is more than conjecture, speculation or guesswork.

There was competent evidence before the jury.

 Reliance next attacks the damages awarded as to loss of other profits. Sparks' case regarding this centers around a letter written from Cities Services Company to Sparks. It follows:

"Thank you for confirmation of $1665.00 price for lining 25 cars. Commitment on the 61 cars due late this year at the same price of $1665.00 will depend on the quality and timeliness of the cars now being processed. This is true of the following 200 cars at the price of $1695.00 each. signed R.E. Howard, Manager, Transportation Operations."

The crux of the matter is whether this and other evidence is sufficient to sustain the jury's finding. Taken alone, the letter would be sufficient to sustain the jury's award. One may consider business which might have been expected in light of past development and existing conditions. *Southwest Battery Corp. v. Owen, supra.* This letter and its intent was hotly contested. There was considerable evidence as to whether or not Sparks would have gotten the remaining 261 cars and what factors would have influenced the decision. If the jury only had the letter and conflicting testimony, the jury's award would certainly be suspect. There is, however, other competent evidence before the jury which aids them in making their determination of lost profits. Sparks had received numerous contracts from other companies in the recent past and during this time. These contracts were approximately for the same number of cars and for the same price. Sparks had completed these contracts with little or no complaint concerning the quality or timeliness of the work. There was evidence that Sparks had a history of receiving repeat business. All of these factors the jury could have considered in arriving at the amount of lost profits. If there is conflicting evidence of probative nature in the record, a determination of the issue is for the jury. *Air Conditioning, Inc. v. Harrison-Wilson-Pearson,* 151 Tex. 635, 253 S.W.2d 422 (1952). Having used the appropriate criteria for the determination of no evidence and insufficient evidence points, *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965), *Goodyear Tire & Rubber Co. v. Jefferson Construction Co.,* 565 S.W.2d 913 (1978), there is sufficient evidence to support the jury's findings. Point of error number three is overruled. The judgment of the trial court is affirmed.